IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ANITA LUGO,                            §
                PLAINTIFF,             §
                                       §
V.                                     § CIVIL ACTION NO. 4:08-CV-301-Y
                                       §
MICHAEL J. ASTRUE,                     §
COMMISSIONER OF SOCIAL SECURITY        §
                DEFENDANT.             §

FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of

the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.      STATEMENT OF THE CASE

Plaintiff Anita Lugo brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title

42 of the United States Code for judicial review of a final decision of the Commissioner of the

Social Security Administration denying her claim for supplemental security income or SSI benefits

under Title XVI of the Social Security Act. Lugo applied for SSI benefits on May 20, 2003, alleging

disability commencing October 20, 2002.[1] (Tr. 119). The Social Security Administration denied

_____

[1] The first month for which SSI benefits can be paid is the month following the month in which the
application was filed regardless of how far back in time disability may extend. 20 C.F.R. § 416.335.

her application for benefits both initially and on reconsideration, and Lugo requested a hearing before an administrative law judge (the "ALJ"). The ALJ held a hearing and issued an unfavorable decision in 2005 that was subsequently vacated by the Appeals Council. (Tr. 41-49, 53).

On remand, ALJ James A. Wendland held another hearing on May 3, 2007, in Fort Worth, Texas. (Tr. 932). Lugo was represented by counsel and testified during the hearing, as did a medical advisor and vocational expert. On June 15, 2007, the ALJ issued a decision that Lugo was not disabled and was not entitled to benefits because she retained the ability to perform a modified range of light work activity. (Tr. 14-28). The Appeals Council denied Lugo's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 5).

B.    STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. § 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir.

2000). Third, disability will be found if claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* § 416.920(d). Fourth, if disability cannot be found on the basis of claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* § 416.920(f). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* § 416.920(g); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* The court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C.      ISSUES

    1.      Whether appropriate weight was given to medical source opinions;

    2.      Whether the ALJ properly assessed Lugo's credibility; and

    3.      Whether the Commissioner met his burden at Step Five.

D.      ADMINISTRATIVE RECORD[2]

    1.      Treatment History

Lugo was referred to James L. Baxter for psychological evaluation on January 9, 2002, as part of a vocational rehabilitation program. (Tr. 200-203). Lugo was thirty years old. She reported that she grew up in a dysfunctional home and became involved with drugs when she was in school. She married her first husband at age 16. Lugo was separated from her second husband and lived with her four children, ages 5, 7, 9 and 12, and her mother. Lugo had attended a G.E.D. preparatory course, but had failed the G.E.D. test four times. (Tr. 201). Baxter administered a battery of tests, which reflected that Lugo was functioning at a borderline to dull normal level of mental ability. (Tr. 202). She also reported being uncomfortable when she was around other people. Baxter opined that Lugo was best suited for housekeeping, laundry, or food service occupations. (Tr. 203).

Lugo went to the psychiatric emergency center at her employer's suggestion on October 3, 2002, because she needed a refill of her medication. (Tr. 222-230). She reported that she had been depressed for years and had been on the antidepressant Paxil since 2001, but over the past month had noticed increased crying, increased depression, increased irritability, an inability to concentrate,

---

[2] Lugo challenges the Commissioner's decision relating to her mental impairments, not her physical impairments. The summary of the administrative record is limited to the matters relevant to her claims.

and an inability to focus at work. She also reported sleep and appetite disturbance, decreased energy, and decreased motivation, and she had not been to work in a week. (Tr. 222). Lugo had beat up her boyfriend on the preceding Saturday night, which she had never done before. (Tr. 224). Lugo was diagnosed with major depressive disorder and generalized anxiety disorder, and she was assigned a current Global Assessment of Functioning score of 60.[3] Her dosage of Paxil was increased, and she was given a prescription for the antidepressant Trazodone. (Tr. 227).

Lugo sought treatment from Tarrant County Mental Health and Mental Retardation Services (MHMR) in January 2003. (Tr. 316-345). She complained of depression, frequent panic attacks, and crying spells. Lugo reported that her first panic attack occurred when she was eleven years old. She had a history of cocaine and alcohol abuse, and admitted recent alcohol use, but she had not used drugs in four years. (Tr. 316). Lugo's medical history was positive for hepatitis, elbow surgery, gunshot wounds to each leg, and a head injury that caused memory loss and blurred vision. (Tr. 316). Lugo was on probation for welfare fraud, which she reported was her first criminal offense. (Tr. 317).

On examination, psychiatrist Robert L. Mims, M.D., noted that Lugo was hyperactive, with rapid speech and increased productivity, and her mood was depressed and anxious. (Tr. 317). Her recent memory, remote memory, and immediate recall were intact. Lugo reported a sixth grade education. She had some computer and office skills, but had never kept a job for more than ten

---

[3] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994)(DSM-IV). A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning. DSM-IV at 34.

months. (Tr. 318). Lugo's thought process was circumstantial, but did not reflect loose or bizarre ideas, and she demonstrated fair insight, good judgment, and fair concentration. (Tr. 318). Mims diagnosed major depression, recurrent and severe; panic disorder by history; and alcohol abuse. He assessed a GAF score of 40.[4] (Tr. 320). Mims prescribed Paxil and Trazodone. (Tr. 321).

Progress notes indicate that Lugo continued to complain of depression, irritability, and fear. (Tr. 304, 314). She indicated that medication was helpful in addressing her depression, but she still experienced anxiety and social phobia. (Tr. 314). She reported that she did not want to get out of bed and was afraid of riding in cars, which was a fear that had progressively worsened after she was involved in a car accident. (Tr. 304). She complained of significant stress related to financial problems and issues with her teenaged son, and admitted that she did not always take her medication as prescribed. Mims increased Lugo's dosage of Paxil. (Tr. 305, 314).

On May 20, 2003, Lugo's mood and effect were described as bland but euthymic, and she reported improvement. She had recently agreed to have her sister appointed as guardian of her teenaged son, which had relieved some of her stress. She had also started riding the bus, which she considered an indication that she was better. (Tr. 296). In July, Lugo complained of some irritability, crying spells, and continued difficulty falling asleep, but had not increased her medication as previously instructed. (Tr. 282). Lugo's diagnoses included major depression, severe and recurrent, without psychotic features; panic disorder by history; and alcohol abuse. She was assigned a current GAF score of 40. (Tr. 283). Mims saw Lugo again in September and made no

---

[4] A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.* at 34

treatment changes after finding that she was behaviorally stable and improved on her current medication regimen. (Tr. 274-75).

During her MHMR visit on October 14, 2003, Lugo's mood was depressed and she was briefly tearful, but she was clean, appropriately dressed, and made good eye intact with the nurse. Her thoughts were organized and goal-directed, and her attention and concentration were assessed as good. She denied any suicidal thoughts, hallucinations, alcohol use or illicit drug use, but complained of headaches, decreased appetite, nausea/vomiting, and hair loss. Lugo rated her depression as a 5 on a scale of 1 to 10, but the nurse thought that Lugo looked "much more depressed than she admits." (Tr. 270). Lugo's depressive symptoms placed her in the moderate to severe category. She recently ended her relationship with a boyfriend because he was abusive and an alcoholic. She had been living with the boyfriend, but his house burned and she lost many of her personal belongings. She was compliant with her medications, but continued to have difficulty sleeping. The nurse conferred with Mims, who increased Lugo's dosage of Trazodone. (Tr. 270)

Lugo returned to the psychiatric emergency center of John Peter Smith Hospital on January 12, 2004. (Tr. 390-400). She complained of feeling suicidal and the sudden onset of hallucinations. She had been out of her medications for ten days and was under stress because of family and financial problems. (Tr. 392). She was diagnosed with major depressive disorder, moderate and recurrent, with psychotic features, and panic disorder without agoraphobia. She was assigned a current GAF score of 35. (Tr. 395).

MHMR progress notes in 2004 indicate that Lugo continued to report crying spells, irritability, anxiety, decreased attention to personal hygiene, restless sleep, increased memory

problems, headaches and dizziness. (Tr. 405-33). Her medication was adjusted as necessary to address her complaints of increased symptoms and stress. (Tr. 425). Her GAF score remained at 40. (Tr. 423, 429, 432).

Mims completed a mental residual functional capacity questionnaire in October 2004. (Tr. 434-38). He indicated that Lugo was seen at MHMR approximately every six weeks for treatment of major depression. Although Lugo's condition was moderately responsive to medication, Mims opined that Lugo had not achieved full remission and had experienced significant side-effects from treatments, although most had abated with time. He also noted that Lugo's depression had been severe enough to warrant hospitalization for psychosis and suicidal ideations, and she continued to have difficulty with day-to-day functioning and episodes of irritability, lethargy, and impaired concentration. He assigned a fair prognosis. (Tr. 434).

Mims opined that Lugo had a limited, but satisfactory ability to carry out very short and simple instructions, ask simple questions, get along with coworkers or peers, respond appropriately to change in a routine work-setting, maintain socially appropriate behavior, adhere to basic standards of cleanliness, and use public transportation, but he found that Lugo would be unable to meet competitive standards with respect to regular attendance and punctuality; working in coordination or proximity to others without being unduly distracted; completing a normal workday and work week; performing at a consistence pace without an unreasonable number and length of rest periods; understanding, remembering or carrying out detailed instructions; dealing with the stress of semiskilled or skilled work; interacting with the general public or traveling to unfamiliar places. (Tr. 436-37). He also anticipated that Lugo would miss more than four days of work per month.

Mims found that alcohol or substance abuse did not contribute to Lugo's impairments because she had been sober for four years. He considered Lugo capable of managing benefits in her own best interest. (Tr. 438).

Mims evaluated Lugo on November 18, 2004. (Tr. 448-449). Lugo was somewhat exuberant, and Mims was uncertain if this signified antidepressant-induced hypomania, also referred to as bipolar III. (Tr. 448). Mims wanted to increase the frequency of Lugo's MHMR visits because of the possibility of a bipolar disorder. (Tr. 448). At her MHMR appointment on December 15, 2004, Lugo was moderately depressed. The nurse had difficulty assessing Lugo's condition because Lugo would frequently change her answers when questioned. She denied any hallucinations or substance abuse, and reported having good days and bad days. She occasionally thought of killing herself, but would not do it because of her children. (Tr. 447). The nursed consulted with Mims, who prescribe Trileptal for Lugo as a mood stabilizer. (Tr. 446, 447).

Lugo was hospitalized on December 20, 2004, for a suicide attempt. (Tr. 458-488). She reported that her children had a fight, which caused her to take an overdose of Trazodone combined with alcohol. (Tr. 462). Her diagnoses were major depressive disorder, recurrent and severe, and alcohol abuse. A GAF score of 40 was reported for current functioning. (Tr. 468). Her GAF score was 50-55[5] on discharge and she was instructed to see Mims at MHMR in one week (Tr. 458).

Lugo returned to see Mims on January 26, 2005. (Tr. 445-446). She reported that she was required to spend her weekends in jail for the next month. Mims anticipated that this would interfere

_____

[5]. A GAF score of 41-50 reflects serious symptoms or any serious impairment in social, occupational or school functioning. DSM-IV at 34.

with her ability to take her medications consistently. (Tr. 446). He noted that she showed a good response and mood stabilization on her current medications. (Tr. 446).

Lugo went to the emergency room on July 19, 2005, and reported that she wanted to hurt herself. (Tr. 663, 667, 671). She complained of depression and auditory hallucinations that sounded like barking dogs. (Tr. 664). The diagnosis was Major Depressive Disorder and anxiety, with a current GAF score of 40. (Tr. 669). She went to the emergency room again in November 2005 for chest pain and anxiety. (Tr. 656-658). Lugo continued her treatment with MHMR from October 2005 through June 2006. (Tr. 501-592). Lugo denied using alcohol or illicit drugs during this period.

Lugo was hospitalized on February 12, 2006, because she tried to cut her wrist after arguing with her boyfriend and children. (Tr. 649). She admitted drinking a six-pack of beer, but reported that this was her first alcoholic drink in six months. (Tr. 651). Lugo saw Mims on an urgent basis related to her suicide attempt. (Tr. 542, 646). She explained that she was upset after arguing with her teenaged son, but calmed down while talking to Mims. Mims increased Lugo's medication and recommended additional family therapy to improve Lugo's parenting skills. (Tr. 542). In March 2006, Mims observed that Lugo's mood was almost euthymic and she appeared to have restabilized in the face of ongoing family stress. (Tr. 531). Lugo's case manager opined that Lugo's substance abuse was in remission. (Tr. 535-40).

In May 2006, Lugo was off her medications for about three weeks after she had gallbladder surgery. Mims noted that Lugo was aware of the consequences if she was off her medications, but compliance remained an issue for her, and he remarked on how she can appear to be functional yet be unable to manage her own medications. (Tr. 511). During follow-up visits in May and June,

Lugo showed moderate progress and was able to refill her pill box with her weekly supply of medications without direction. (Tr. 506-07). Lugo reported that she had been tempted to use drugs again because some of her old friends had been visiting her, but she was reminded of what she could lose and was encouraged to find community resources to help her remain clean and sober. (Tr. 503). Lugo also reported being under a lot of stress because her mother was ill, but Mims noticed that Lugo had "a long-term pattern of just being able to cope with everyday life." (Tr. 502). He observed that she was almost always late for her appointments, and despite appearing to have a higher level of functioning, she had proved to be unable to manage her own medications without using a weekly pill minder and repeated training on how to use it. (Tr. 502).

Lugo went to the psychiatric emergency center on August 8, 2006, complaining that she had been feeling bad for three weeks. (Tr. 874). She described mood changes, increase agitation, and annoyance related to her four children. She also admitted having auditory hallucinations and suicidal thoughts. (Tr. 874). She was given a prescription for the antipsychotic Risperdal. (Tr. 872).

The ALJ wrote to Mims on August 31, 2006, to request additional evidence or clarification regarding his opinion about what Lugo was still able to do despite her impairments. (Tr. 688). Mims responded on September 13, 2006. (Tr. 686-687). He advised that he could not comment on Lugo's physical impairments, but opined that Lugo's psychiatric disabilities alone precluded any sort of gainful employment. (Tr. 686). He noted that she suffered from major depression with psychotic features and panic disorder, which required chronic treatment with antidepressant and antipsychotic medication. He also stated that Lugo had frequent panic attacks, paranoia, and

agoraphobia. Medication was somewhat helpful, but had not resulted in remission. Mims opined that Lugo could not interact with the public at all because she easily misinterpreted what people said and was prone to emotional outbursts. He also opined that her history of a closed head injury had affected her ability to learn new material and made it difficult for her to function in everyday life. (Tr. 686). He clarified that he did not believe that alcohol abuse was a material factor because Lugo had been sober for five years. (Tr. 687).

Mims further opined that Lugo was extremely impaired in her ability to follow even simple instructions, and she would lose new information presented to her after only three to five minutes. He also felt that she was not capable of managing funds and would need a representative payee. Mims did not think Lugo was able to maintain any position in competitive employment because of her inability to retain new information and her sudden panic attacks. He further noted that Lugo had an underlying personality disorder that made it difficult for her to get along with others even when she was at her best level of functioning. Mims advised that Lugo's insight into her problem was minimal, that she would initially appear to be functioning adequately, and he only began to realize the full extent of her limitations after seeing her regularly. (Tr. 687).

Lugo was admitted to Huguley Hospital on September 29, 2006 for suicidal ideation and plans to overdose or jump off a bridge. (Tr. 719, 722). She complained of hallucinations, mood swings, anxiety and panic attacks, and reported drinking a 24-pack of beer and four or five glasses of liquor. (Tr. 722, 726-27). She was diagnosed with schizoaffective disorder, bipolar type, and a current GAF score of 35 was reported. (Tr. 724, 727). On October 10, 2006, Lugo returned to the hospital because of increased depression and suicidal thoughts. (Tr. 697). She reported auditory

and visual hallucinations and mood swings, and had not been taking her medication as directed. (Tr. 699). She was discharged with instructions to see her psychiatrist at MHMR and was encouraged to attend AA meetings and obtain a sponsor. (Tr. 703).

On September 8, 2006, Lugo was stressed because she was unable to pay her probation fees and reported being unable to ride in a car without panicking. Mims reiterated that Lugo can appear to be deceptively high functioning, but has difficulty following even simple instructions. He observed that much of the time she seemed to be overwhelmed by her environment. (Tr. 799). In October, Lugo attributed her recent hospitalizations to her severe urge to drink, but she adamantly denied drinking alcohol. (Tr. 778). When she saw Mims on November 17, 2006, Lugo admitted that she had claimed that she had been drinking so she could get into two different rehabilitation programs and obtain medication that was not available through MHMR, but she really had not been drinking. She admitted having the urge to drink. (Tr. 782). Mims expressed frustration because Lugo was not forthcoming with him and cautioned that she would be difficult to treat if she sought medical care under false pretenses. (Tr. 783).

At her MHMR appointment in January 2007, Lugo rated her depression as a 6 on a scale of 1 to 10. She also expressed a fear of people, which the MHMR nurse found surprising because Lugo had started working the previous week as a motel front desk clerk on a full-time basis. She was instructed to continue her current medications and return in one month. (Tr. 777).

Following remand by the Appeals Council, Lugo was referred for two consultative examinations. Michael Bridgewater, Ph.D., examined her on November 23, 2006. (Tr. 804-812). Lugo reported that her schoolwork deteriorated after she began using drugs and she dropped out of

school before finishing the sixth grade. Lugo also reported an unstable work history. (Tr. 805). She reported that her first suicide attempt was in 2005 when she took an overdose of pills, and she had made a second attempt by cutting her wrist. She asserted that she could not tolerate stress and complained of having chills during the interview. She admitted that she had been an alcoholic for twenty-one years, but she had not had a drink in over thirty days and understood that she needed to quit drinking because she had hepatitis. Lugo was very tense and cried several times. (Tr. 805, 806). She also reported feeling uncomfortable in crowds or unfamiliar situations. (Tr. 805).

Lugo said that her average day consisted of awaking at 6:30 a.m. to get her children up and ready for school. After her children left for school, Lugo slept until 11:30 a.m., then straightened the house and waited for her children to get home. She cooked dinner for her children and made sure they completed their homework. After the children were in bed, Lugo would watch television or talk with her friends until going to bed at 10:30 p.m. She reported being in many abusive relationships with different men, which Bridgewater considered an indicator of poor judgment. Lugo gave the impression of being a loner, but was observed being very friendly with another woman sitting in the psychologist's waiting room and explained that the woman lived in the same apartment complex and often helped her with her children. (Tr. 806).

When Bridgewater gave her a five-part instruction, Lugo correctly performed three of the parts. (Tr. 807). Lugo was given a list of three items to remember and could remember one item after a five-minute delay. She was also asked to name the most recent four Presidents, but she mentioned only George Bush. Bridgewater noted that Lugo's verbal expression was often tangential and circumstantial, and that her verbal and non-verbal communications reflected feelings of

inferiority. Her mood and affect were depressive and changeable, but congruent, and she showed no psychotic features. Bridgewater advised that Lugo's judgment, insight, and history revealed instability and a need for continued therapy. (Tr. 807). Bridgewater diagnosed major depression, recurrent and severe; panic disorder; alcohol abuse in early remission; polysubstance dependence in sustained, full remission; and borderline intellectual functioning. He assigned a GAF score of 50, with a guarded prognosis. Bridgewater opined that Lugo understood the meaning of filing for benefits, but would need assistance in managing her benefits based on her history of welfare fraud, alcohol abuse, and poor math performance. (Tr. 808).

Bridgewater also prepared a medical source statement in which he found moderate limitation in Lugo's ability to understand, remember and carry out short, simple instructions; marked impairment in judgment; and extreme limitation in her ability to understand, remember and carry out detailed instructions. (Tr. 809). He further found moderate impairment in Lugo's ability to interact appropriately with the public or co-workers; marked impairment in her ability to interact appropriately with supervisors and to respond appropriately to work pressures in a usual work setting; and extreme limitation in her ability to respond to changes in routine work setting. (Tr. 810). Bridgewater opined that Lugo could improve her interaction with co-workers and supervisors by remaining alcohol free, and he recommended that she be supervised in the management of her benefits for at least one year. (Tr. 811).

Psychologist Barbara Fletcher examined Lugo on January 26, 2007. (Tr. 678-685). Lugo reported four suicide attempts, with the first attempt at age 12. Her current symptoms included tearfulness, irritability, decreased energy, sleep disturbance, decreased motivation, a loss of interest

in pleasurable activities, and social withdrawal. She reported daily episodes of anxiety and a history of panic symptoms, with panic attacks occurring on a weekly basis. (Tr. 678-79). She had a history of alcohol abuse, with periods of sobriety, and had been drinking daily until she stopped two months ago after attending a substance abuse program. (Tr. 680). Lugo administered her own medications and managed her own appointments. She cooked, cleaned, and shopped. She lived with her children and kept in contact with her family, but had no friends and seldom attended church. She had worked for six months the previous year at a job answering telephones. (Tr. 679). She had one more year to serve on probation for fraud. (Tr. 680).

Fletcher found Lugo to be respectful and cooperative, and she exhibited no evidence of a thought disorder. Lugo's mood was reported as dysthmic, with an appropriate affect. Lugo knew the date and where she was, although she did not know Fletcher's name or occupation. Her intelligence was estimated to be in the low average range. (Tr. 680). Lugo was able to name the current President and three previous Presidents, and remembered two objects after five minutes without prompting. She was able to repeat four digits forward and two digits backward, count backward from twenty, and correctly spell her name backward. She showed insight into her situation. When asked what to do if she was in a house that was on fire, she answered that she would get the children out, and when asked what she would do if she found a sealed, stamped, and addressed envelope, she responded that she would put it in a mailbox. (Tr. 681).

Fletcher diagnosed major depressive disorder, recurrent and moderate; generalized anxiety disorder; panic disorder; and alcohol dependence in early full remission. Lugo's prognosis was guarded because she was considered at high risk for a relapse in her alcohol use. (Tr. 681). Fletcher

also completed a mental assessment questionnaire and opined that Lugo had no impairment in her ability to understand, remember and carry out short, simple instructions. Fletcher assessed slight impairment in Lugo's ability to understand, remember and carry out detailed instructions; make judgments on simple work-related decisions; and interact appropriately with the public, supervisors, or coworkers. (Tr. 683-84). Fletcher found moderate impairment in Lugo's ability to respond appropriately to work pressures and changes in routine work setting. (Tr. 684). Fletcher noted that Lugo's functioning would be significantly improved by a total abstinence from alcohol. Lugo was considered capable of managing her benefits in her own best interest. (Tr. 685).

2.      Administrative Hearing

Lugo testified that she tried to straighten the house during the day while her children were in school. She took her medicine in the morning, which made her sleepy, took a nap, and prepared supper before her children came home. (Tr. 939). She testified that she continued to experience visual or auditory hallucinations, usually when she was running low on her medications. (Tr. 940-941, 956). She tried to work as a motel desk clerk in 2007, but was fired after three weeks because she forgot to attend a meeting with her employer and she did not understand how to do the job. (Tr. 941-942). Lugo testified that she remained on probation for welfare fraud because her probationary term had been extended. (Tr. 943).

Lugo denied abusing alcohol in the past five years, (Tr. 945), but the ALJ confronted her with her report to emergency room staff in February 2006 that she had consumed a six-pack of beer and her consumption of a large amount of alcohol prior to being hospitalized in September 2006. (Tr. 946, 948). Lugo asserted that she had not used any alcohol after she was discharged from the

hospital in September 2006.  (Tr. 950-51).

Lugo testified that she continued to have panic attacks that occurred approximately twice a week and were usually triggered by too many people, too much stress, or new surroundings.  (Tr. 952).  The panic attacks caused her to sweat and hyperventilate and made her head hurt.  Her panic attacks lasted for about ten minutes, but she would have to lie down or nap for up to two hours after an attack subsided.  (Tr. 953-954).  Lugo also testified that she tried to cook meals, but burned a lot of food because she would forget would she was doing.  She testified that she got along well with her children, but she sometimes argued with them, which triggered crying spells. She addressed the problem by leaving the room because she did not want to hit her children.  (Tr. 954-55).

Medical expert John Simonds testified that Lugo's physical impairments included hepatitis, which caused fatigue, but the majority of her medical records related to alcoholism and psychiatric problems.  (Tr. 957-60).   He also remarked on the existence of significant inconsistencies in the findings of the consultative psychological evaluations.  (Tr. 960). He found that Lugo had a depressive disorder, which had varied over time, but he found that her condition improved when she complied with treatment and avoided alcohol.  (Tr. 961-63).  Simonds opined that Lugo should be limited to simple work because of her intelligence and depression.  He further limited her to superficial contact with the public given her panic disorder and anxiety.  Simonds found no basis for imposing any physical limitations other than avoiding chemical exposure, which could further damage her liver.  (Tr. 963).

On cross-examination, Simonds admitted that there were few objective reports documenting the frequency of Lugo's use of alcohol, but testified he based his testimony on records reflecting a

diagnosis of alcohol abuse in early remission.  He also testified that depression generally limited a person to tasks at the lower end of detailed and would not render a person unable to retain information or follow simple instructions.  He testified that a person's inability to follow even simple instructions was usually associated with organic brain disease. (Tr. 971).

Vocational expert Carol Bennett testified that Lugo's previous work packaging food was unskilled and required light exertion.  Lugo also worked as a PBX operator, which was semi-skilled and sedentary.  Lugo had worked for two months at a bindery, but Bennett testified that this was not long enough to qualify as past relevant work. (Tr. 976-78).  The ALJ asked Bennett to consider  a person of Lugo's age, limited education, and work experience, with the ability to perform a modified range of light work, but

> not required to work with more than mildly decreased ability to maintain concentration and attention, not required to understand, remember and carry out more than simple instructions, not required to have more than superficial interaction with [the public,] not required to adapt to more than simple changes in a routine work setting more often than on a weekly basis.

(Tr. 980).  Bennett testified that such an individual could perform Lugo's past job of hand packer. She also testified that there was other suitable unskilled work, including inspectors (with at least 48,000 jobs in the nation) or graders and sorters (with at least 20,000 jobs in the nation).  Bennett testified that none of her testimony conflicted with information in the <u>Dictionary of Occupational Titles</u> (DOT).  (Tr. 981).

Bennett testified that an individual who needed to lie down for two hours each day or experienced panic attacks twice per week requiring a two-hour recovery period would be unable to perform Lugo's past work or any of the other jobs Bennett had identified.   A person who was

moderately to extremely impaired in her ability to follow even simple instructions also could not perform these jobs. (Tr. 982). Bennett also opined that a person who was markedly impaired in the ability to interact appropriately with supervisors would probably be terminated, (Tr. 984), nor could an individual maintain employment if markedly impaired in the ability to respond appropriately to normal work pressures. (Tr. 985-986). Bennett testified that a person unable to meet competitive standards with respect to regular attendance and punctuality; completing a normal workday or workweek without interruption from psychologically based symptoms; or performing at a consistent pace without an unreasonable number and length of rest periods would be unable to sustain employment. (Tr. 988-989).

3.      ALJ Decision

The ALJ found that Lugo had not engaged in substantial gainful activity since filing her SSI application and that she had the following severe impairments: major depressive disorder; panic disorder; borderline personality disorder; a history of borderline intellectual functioning; alcohol abuse in early remission; hepatitis C; status post-left elbow fracture with internal fixation; and leg pain secondary to a history of gunshot wounds. He found no impairment or combination of impairments meeting or equaling the requirements of a listed impairment. He also determined that alcohol abuse was not a material factor in the case. (Tr. 27). The ALJ found that Lugo's mental impairments caused mild restriction in activities of daily living and moderate difficulty in her ability to maintain social functioning and concentration, persistence, or pace. He further found one extended episode of decompensation in December 2004. (Tr. 27).

In assessing Lugo's residual functional capacity (RFC), the ALJ found Lugo capable of a

modified range of light work activity, but with these sustained work-related mental limitations: a mildly decreased ability to maintain attention and concentration; an inability to understand, remember and carry out more than simple instructions; no more than superficial interaction with the public; and an adaptability for no more than simple changes in routine work setting on a weekly basis. (Tr. 27-28). The ALJ found that this RFC precluded the performance of Lugo's past relevant work, but based on the vocational expert's testimony, found Lugo could perform other work that existed in significant numbers in the national economy. Accordingly, he concluded that Lugo was not disabled. (Tr. 28).

E.    DISCUSSION[6]

1.    Medical Opinions

Lugo contends that the ALJ failed to give due consideration to the medical source opinions, especially the opinion of her treating specialist at MHMR, and erred in relying on the inconsistent testimony of a medical advisor who had never examined her.

Generally, opinions, diagnoses, and medical evidence from a treating physician who is familiar with a claimant's impairments, treatments, and responses should be given great weight in determining disability. *See Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). The ALJ assigns controlling weight to the opinions of a treating physician if well-supported by medically acceptable clinical and laboratory diagnostic

---

[6] In her reply brief, Lugo presents a new argument related to the ALJ's failure to articulate the correct definition of a severe impairment. The ALJ's decision reflects that he understood the de minimis nature of the severity standard and he cited to the landmark Fifth Circuit case that addresses that standard. (Tr. 16, 24). *See generally Stone*, 752 F.2d at 1101. Lugo's complaint presents no basis for disturbing the Commissioner's decision.

techniques and not inconsistent with other substantial evidence in the record. 20 C.F.R. § 416.927(d)(2); *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995). The disability regulations also set forth factors to be considered in weighing medical opinions, which include the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. § 416.927(d);. *See also* SOCIAL SECURITY RULING 96-2p, 96-5p. The ALJ must consider each of these factors before declining to give any weight to the opinions of the claimant's treating specialist. *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). But the determination of disability always remains the province of the ALJ, and the ALJ can decrease the weight assigned to a treating physician's opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett*, 67 F.3d at 564; *Greenspan*, 38 F.3d at 237. *See also* 20 C.F.R. § 416.927(e).

Lugo asserts that Mims has served as her treating psychiatrist since 2003 and completed an assessment of her functional abilities that is consistent with the opinions of the consultative examiners and the state agency medical consultants who considered her application at the initial and reconsideration stages of review. She notes that when the limitations that Mims assessed were submitted to the vocational expert, Bennett testified that there would be no job that a worker with these limitations could perform. Lugo further asserts that the ALJ erred in relying on Simonds' testimony because Simonds is a non-examining source and offered opinions that are inconsistent with the record.

Lugo contends that there is an inconsistency between Simonds' testimony that alcohol use

factored into Lugo's impairments and the ALJ's finding that Lugo's history of alcohol abuse was not a material factor in her case. (TR. 861-63). She also challenges Simonds' "historical assumption" that she had been abusing alcohol because the medical record documented only three instances in which she had used alcohol, in December 2004, February 2006, and September 2006.

The ALJ made a specific finding about materiality in compliance with the Contract with America Advancement Act, which withholds benefits if alcoholism or drug addiction is a contributing factor material to the Commissioner's determination that the individual is disabled. (Tr. 15). *See generally* 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); 20 C.F.R. § 416.935. The ALJ did not deny that Lugo had a history of alcohol abuse and his decision reflects that he understood that there was a direct relationship between Lugo's alcohol use and history of delusions, hallucinations, psychotic behavior, and suicidal ideations. (Tr. 20-21, 24). The ALJ's decision is not inconsistent with the opinions that Simonds offered.

Lugo's attempts to minimize her alcohol use are also contrary to the record. She admitted to both consulting examiners that she had a history of alcohol abuse, and she admitted to Mims that she had used alcoholism as a ploy to obtain medication. (Tr. 19, 23). Both consultative examiners observed that Lugo's condition could be improved by avoiding alcohol. Even when Lugo did not admit to drinking, the ALJ noted that Lugo's condition stabilized during enforced periods of sobriety. (Tr. 21). The ALJ also noted that the MHMR records could not be used to prove or disprove Lugo's use of alcohol because she did not report drinking to Mims or the MHMR staff. In fact, the ALJ pointed out other instances in the record that illustrated that Lugo was willing to compromise her relationship with treating sources, which rendered her treatment records an

untrustworthy source of information. Lugo cites Simonds' testimony that her mental impairment might meet the criteria of a listed impairment if her symptoms remained severe after she abstained from alcohol for a year, but as Simonds noted, the evidence was that Lugo had been sober for only six months. (Tr. 963).

Lugo also challenges Simonds' testimony that a depressive disorder can never reduce an individual's ability to function to lower than the capacity to perform simple tasks unless the individual was prone to frequent hospitalizations. (Tr. 971-74). She asserts that there is no support in the Commissioner's regulations, rulings, or policy statements for such a conclusion. Simonds' testimony is contained within an argumentative exchange between Simonds and Lugo's counsel, during which Simonds seems to indicate that he did not intend to offer such a declaratory opinion. Moreover, Lugo has not demonstrated that Simonds' testimony that she in fact retained the ability to perform simple work is inconsistent with the objective evidence. Like Simonds, consulting examiner Fletcher and the state agency medical consultants[7] found Lugo retained the ability to perform simple tasks, and consulting examiner Bridgewater found that Lugo had moderate limitation in this area but could still function satisfactorily. (Tr. 362-64, 804-812, 683-84). The ALJ acknowledged Mims' opinion that Lugo had poor memory and concentration and was unable to follow even simple instructions, but observed that Mims had admitted that his patient was intentionally deceptive and that Mims was not aware of all of the medial reports, including Lugo's

---

[7] The state agency consultants found Lugo could understand, remember and carry out simple instructions, make simple decisions; attend and concentrate for extended periods; interact adequately with co-workers and supervisors; and respond appropriately to changes in routine work setting. (Tr. 364). The ALJ observed that these opinions were offered by specially trained experts unencumbered by the empathy inherent in a treating physician-patient relationship. (Tr. 24).

inconsistent presentations during her two consultative evaluations. (Tr. 22, 23).

The ALJ found that Simonds was the only expert familiar with all of Lugo's records and her testimony at the hearing, and further found that Simonds offered opinions that were consistent with and well-supported by the other evidence. (Tr. 23-24). The ALJ adequately explained why he accepted Simonds' opinions over those provided by Mims .[8] Lugo has not demonstrated that the ALJ's assessment of the medical opinions of record is contrary to law or unsupported by substantial evidence.

2.    Credibility

The ALJ found that the type of subjective complaints Lugo presented were reasonably related to her medically determinable impairments, but based on the record as a whole, Lugo's testimony was not considered credible. Lugo asserts that the medical records and the opinions of treating and examining sources support her statements about her depression, anxiety, panic attacks, inability to sustain attention and concentration, and psychotic episodes.

In evaluating a claimant's subjective complaints, the ALJ first considers whether there is a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms. 20 C.F.R. § 416.929(b); SOCIAL SECURITY RULING 96-7p. Once the impairment is found, the ALJ evaluates the intensity, persistence and limiting effects of the symptoms on the claimant's ability to do basic work activities. 20 C.F.R. § 416.929(c). Factors to consider include

---

[8] In her reply brief, Lugo urges that the ALJ erred because he assessed Simonds' testimony without enumerating each of the relevant factors outlined in the regulations. *See generally* 20 C.F.R. § 416.927(d).The ALJ's decision reflects that he considered these factors in substance if not expressly and understood the nature of Simonds' expertise, his role as a medical advisor, his overall familiarity with the medical records, and the consistency of his testimony with the other evidence of record. (Tr. 23-24).

(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) the medication used to alleviate the pain; (5) other treatment measures; and (6) other relevant factors. *Id.* § 404.1529(c)(3). An ALJ's unfavorable credibility evaluation will not be upheld on judicial review where the uncontroverted medical evidence shows a basis for the claimant's complaints unless the ALJ weighs the objective medical evidence and articulates reasons for discrediting the claimant's subjective complaints. *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir.1994); *Abshire v. Bowen*, 848 F.2d 638, 642 (5th Cir. 1988).

The ALJ acknowledged that he had a duty to evaluate Lugo's credibility in accordance with the regulations. (Tr. 18-19). He noted as a threshold matter that her credibility was subject to impeachment because she was on probation for welfare fraud, which was a crime of dishonesty in the form of false statements. He also questioned the probative value of her testimony given issues related to her noncompliance with treatment, her willingness to compromise her relationship with treating sources, and notable inconsistencies in her statements, particularly with respect to her alcohol use. (Tr. 19). In assessing Lugo's post-remand consultative examinations, the ALJ further noted that the two examinations were just a few months apart, but the differences in her presentation at each interview were pronounced and suggested that she was behaving in a selective manner in presenting her subjective complaints at these examinations. (Tr. 22). The ALJ's decision reflects that he followed the relevant law regarding credibility assessments, and his determination that Lugo was not credible is supported by substantial evidence.

3.      Vocational Expert Testimony

Lugo also contends that the Commissioner has not carried his burden at the fifth step of the

sequential evaluation process. She asserts that the ALJ's decision that she can perform other work existing in significant numbers in the national economy is based on vocational expert testimony that was provided in response to an inaccurate hypothetical question. The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001).

The ALJ asked the vocational expert to identify a modified range of light work suitable for a worker with several work-related mental limitations, including no more than a mildly decreased ability to maintain attention and concentration. Lugo asserts that this aspect of the question was deficient because the ALJ found in his written decision that she had a moderate degree of difficulty in her ability to maintain concentration, persistence, or pace. (Tr. 27). The ALJ's decision, however, reflects that he found Lugo had the RFC for the sustained performance of light exertion that accommodated, among other restrictions, a mildly limited ability to maintain concentration and attention. (Tr. 24, 26, 27-28). There is no conflict between the ALJ's assessment of Lugo's RFC and the hypothetical presented to the vocational expert.[9]

Lugo also contends that the vocational expert identified only categories of jobs rather than

_____

[9] It appears that Lugo is referring to the ALJ's findings related to Steps 2 and 3 of the sequential evaluation process, not the mental RFC assessment developed and used at the later stages of the process. *See generally* 20 C.F.R. § 416.920a (prescribing special technique to be used in the evaluation of mental impairments). The RFC assessment used at Steps Four and Five, and often presented to the vocational expert in the form of a hypothetical, is a more detailed assessment and itemization of various functions that compose the broader categories of functioning, i.e, concentration, persistence or pace, that are measured at Steps 2 and 3. *See* SOCIAL SECURITY RULING 96-8p.

specific jobs within her RFC. This is a new argument not properly raised in her opening brief. Moreover, a vocational expert is called to testify because of his familiarity with job requirements and working conditions. *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995); *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir.1986). The value of a vocational expert is his familiarity with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed. *Vaughan*, 58 F.3d at 132; *Fields*, 805 F.2d at 1170. Using that expertise, Bennett testified about work available for someone with Lugo's RFC, the number of jobs that would be available, and the consistency of her testimony with published vocational resources. Even if the vocational expert's testimony could have been more precise, there must be substantial prejudice to justify disturbing the Commissioner's decision. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Lugo has not demonstrated that the vocational expert offered unreliable testimony.[10]

The administrative record contains substantial evidence supporting the Commissioner's decision that Lugo is not disabled as that term is defined and used in the Social Security Act, and Lugo has not demonstrated that the decision is a result of any significant legal error.

RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

---

[10] In another new argument raised in her reply brief, Lugo contends that the ALJ erroneously equated unskilled work with work requiring one- or two-step job instructions because this conflicts with information in the DOT. (Tr. 26). At best Lugo has demonstrated that the ALJ's statement may not hold true for every unskilled occupation listed in the DOT, but Lugo has not demonstrated that the ALJ erred in relying on the vocational expert's testimony that there exists at least 48,000 inspector jobs and 20,000 sorter/grader jobs that would accommodate Lugo's particular limitations. The vocational expert affirmed that her testimony comports with the DOT.

<u>NOTICE OF RIGHT TO OBJECT TO PROPOSED</u>
<u>FINDINGS, CONCLUSIONS AND RECOMMENDATION</u>
<u>AND CONSEQUENCES OF FAILURE TO OBJECT</u>

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until February 10, 2009. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

<u>ORDER</u>

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until February 10, 2009 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED JANUARY 20, 2009.


_____/s/   Charles Bleil_____
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE